# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIGINIA
### BIG STONE GAP DIVISION

**TOLLIE D. MOORE,** )
    Plaintiff )
)
) Civil Action No. 2:12cv00021
v. ) **REPORT AND**
) **RECOMMENDATION**
**CAROLYN W. COLVIN**[1] )
Commissioner of Social Security, ) By: PAMELA MEADE SARGENT
    Defendant ) United States Magistrate Judge

*I. Background and Standard of Review*

Plaintiff, Tollie D. Moore, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A §§ 423, 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Moore filed prior applications for SSI and DIB alleging disability since April 27, 2006, which were denied by decision dated January 24, 2008. (Record, ("R."), at 111-22.) Moore protectively filed his current applications for SSI and DIB on February 5, 2008, alleging disability since January 25, 2008, due to lumbar spine arthritis, degenerative disc disease, severe back pain, hip pain, leg pain, high blood pressure, high cholesterol, gout, problems sleeping, depression, anxiety and frequent panic attacks. (R. at 18, 308-13, 316-17, 370, 409.) The claims were denied initially and on reconsideration. (R. at 162-64, 175-76, 177-79.) Moore then requested a hearing before an administrative law judge, ("ALJ"). (R. at 189.) The hearing was held on November 18, 2009, at which Moore was represented by an attorney. (R. at 76-108.) By decision dated March 19, 2010, the ALJ denied Moore's claims. (R. at 134-43.) Moore also filed a subsequent DIB application on March 20, 2010, alleging disability since March 20, 2010. (R. at 338-39.) This claim also was denied initially and on reconsideration, and Moore requested a hearing before an ALJ. (R. at 282-84, 288, 291-93, 294.) On September 23, 2010, the Appeals Council vacated the ALJ's March 2010 hearing decision and

remanded the case to an ALJ for further development. (R. at 149-52.) Another hearing was held on March 16, 2011, at which Moore was again represented by an attorney. (R. at 40-75.)

By decision dated April 8, 2011, the ALJ denied Moore's claims. (R. at 18-29.) The ALJ also consolidated the March 2010 DIB application with the February 2008 DIB and SSI applications. (R. at 18.) The ALJ found that Moore met the insured status requirements of the Act for disability purposes through December 31, 2011. (R. at 20.) The ALJ found that Moore had not engaged in substantial gainful activity since January 25, 2008, the alleged onset date. (R. at 20.) The ALJ determined that the medical evidence established that Moore suffered from severe impairments, including discogenic/degenerative disc disorder, borderline intellectual functioning, affective disorder and anxiety disorder, but he found that Moore did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-23.) The ALJ found that Moore had the residual functional capacity to perform a range of medium work,[2] but that he had no useful ability to function in the areas of understanding/remembering detailed instructions and interacting appropriately with the general public, he was significantly limited, but not precluded, in his abilities to carry out detailed instructions and to get along with co-workers/peers, and he had moderate-to-marked impairment in his ability to use public transportation. (R. at 23.) The ALJ further found that Moore would miss approximately two to three days of work annually as a result of his mental impairments. (R. at 23.) Based on his age, education, work history, residual

_____

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2013).

functional capacity and the testimony of a medical expert and a vocational expert, the ALJ found that Moore was able to perform his past relevant work as a general laborer. (R. at 28.) Therefore, the ALJ found that Moore was not under disability as defined in the Act and was not eligible for benefits. (R. at 29.) *See* 20 C.F.R.§§ 404.1520(f), 416.920(f) (2013).

After the ALJ issued his decision, Moore pursued his administrative appeals, (R. at 14), but the Appeals Council denied his request for review. (R. at 1-5.) Moore then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2013). The case is before this court on Moore's motion for summary judgment filed January 23, 2013, and the Commissioner's motion for summary judgment filed March 27, 2013.

## *II. Facts[3]*

Moore was born in 1962, (R. at 308), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has an eighth-grade education and past work experience as an underground coal miner and a general laborer. (R. at 71, 351-54.) At the March 16, 2011, hearing, Moore testified that he experienced nearly constant low back pain that radiated into his right leg, which interfered with his ability to sit or stand for long periods of time. (R. at 48.) Moore testified that he stopped working December 5, 2005, after injuring his back while working as a coal miner. (R. at 56.) He testified that he continued to receive

---

[3] The recitation of medicals contains those facts relevant to Moore's arguments on appeal. Thus, the medicals, as summarized, focus largely on Moore's back impairments and his mental impairments.

worker's compensation treatment for his back every six months. (R. at 57-58.) Moore estimated that he could sit for up to 45 minutes and stand for up to 15 minutes at a time. (R. at 48-49.) Moore testified that he could lift items weighing up to 15 pounds, but could not move an item of that weight back and forth throughout the day. (R. at 49.) He testified that he averaged three or four hours of sleep per night due to pain, which also required him to lie down for an hour or two during the day. (R. at 49-50.) He further testified that he suffered from pain and weakness in his left shoulder and arm due to tendonitis, causing difficulty reaching both overhead and downward. (R. at 50-51.) Moore testified that he also had difficulty gripping with his left hand due to numbness. (R. at 51.) He stated that he took medication for high blood pressure, which controlled it at times. (R. at 51.)

Moore further testified that he experienced depression, felt tired all of the time and experienced panic attacks when he was around several people. (R. at 52-53.) Moore stated that he only visited with his brothers and that he had difficulty remembering things unless he wrote them down. (R. at 53.) He testified that he did not perform any household responsibilities. (R. at 54.) Moore described a bad day as being in a recliner for seven or eight hours. (R. at 54.) He testified that he took Lexapro and Abilify for depression and Lortab for pain, and while his medications helped, his limitations persisted. (R. at 55-56.) Moore testified that his physical and mental problems had worsened over the previous couple of years. (R. at 56.)

Robert Muller, Ph.D., a medical expert, also was present and testified at Moore's hearing. (R. at 58-69.) After thoroughly reviewing Moore's psychological records, Muller opined that he had "pretty significant depression secondary to his chronic physical difficulties." (R. at 63.) He testified that, although Moore had responded somewhat to medications, some significant difficulties with anxiety and

depression remained, but which he did not believe would meet or equal any listing. (R. at 63.)  Muller testified that Lanthorn's opinion regarding the extent of Moore's limitations was not supported by the clinical records. (R. at 63.) More specifically, Muller emphasized notes from Piedmont Community Services and Caring Hearts Free Clinic, reflecting a primary difficulty of going out in public, not depression per se.  (R. at 64.)  He further noted reduction in depression with medications, but continued anxiety in public. (R. at 64.) Muller opined that, while this was a significant problem for Moore, it was not one that would preclude employment if he was in the right setting. (R. at 64.)

Muller opined that Moore was moderately[4] limited in his activities of daily living, experienced moderate difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and he had experienced no episodes of decompensation in a work-like setting for an extended period.  (R. at 66.) Muller further opined that Moore was markedly[5] limited in his ability to understand and remember detailed instructions, moderately limited in his ability to maintain attention and concentration for extended periods, and at least mildly limited in his ability to complete a normal workday or workweek without interruptions from psychologically based symptoms.  (R. at 67-68.)  Muller opined that Moore would miss two to three workdays annually due to his psychiatric condition.  (R. at 68.)  Muller also found that Moore was moderately-to-markedly limited in his ability to interact appropriately with the general public, moderately limited in his ability to get along with co-workers or peers without distracting them

---

[4] Muller defined a moderate limitation as one that significantly impacts an individual's ability to function in a particular area, but does not preclude satisfactory functioning in that area. (R. at 69.)

[5] Muller defined a marked limitation as one that so impacts an individual's ability to function in a particular area that there is no useful ability to function. (R. at 69.)

or exhibiting behavioral extremes and moderately-to-markedly limited in his ability to use public transportation.  (R. at 68-69.)

Barry Hensley, a vocational expert, also was present and testified at Moore's hearing.  (R. at 70-74.)  Hensley classified Moore's past work as an underground coal miner as heavy[6] and skilled and as a general laborer, as performed, as light[7] and unskilled.  (R. at 71-72.)  Hensely was asked to consider a hypothetical individual of Moore's age, education and work history, who had the residual functional capacity set forth in the December 2010 assessment completed by Dr. Richard Surrusco, M.D., coupled with the restrictions that Muller indicated in his testimony.  (R. at 72.)  Hensley testified that such an individual could perform the job of a general laborer at the light exertional level.  (R. at 73.)  Hensley further testified that a hypothetical individual with the limitations testified to by Moore would be precluded from performing even sedentary work.[8]  (R. at 73.)  Hensley also testified that the mental limitations, as testified to by Moore, would further exacerbate and reduce such an individual's capacity for work.  (R. at 73-74.)

---

[6] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting of items weighing up to 50 pounds at a time. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2013).

[7] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting of items weighing up to 10 pounds at a time. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2013).

[8] Sedentary work involves lifting up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2013).

In rendering his decision, the ALJ reviewed records from Indian Path Medical Center; Wellmont Lonesome Pine Hospital; B. Wayne Lanthorn, Ph.D.; Dr. Mark W. Taylor, M.D.; The Regional Rehab Center; Highlands Neurosurgery, P.C.; Stone Mountain Health Services; Dr. Ehab Shalaby, M.D.; Lee Regional Medical Center; Piedmont Community Services; Caring Hearts Free Clinic; Dr. Mark Stowe, M.D.; Appalachia Family Health Center; Abingdon Radiology Services; Dr. Timothy McBride, M.D.; Dr. Thomas Miller, M.D.; Dr. S.C. Kotay, M.D.; Dr. John D. Marshall, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Joseph I. Leizer, Ph.D., a state agency psychologist; Dr. Thomas Phillips, M.D., a state agency physician; and Richard Milan, Jr., Ph.D., a state agency psychologist. Moore's attorney submitted additional records from Dr. TaranDeep Kaur, M.D., to the Appeals Council for review.[9]

Moore saw Annie Manning, a mental health counselor, at Caring Hearts Free Clinic, ("Caring Hearts"), on February 28, 2008. (R. at 652.) He reported depression due to being out of work since April 2006, as well as anxiety attacks when going into stores. (R. at 652.) He stated that the last time he was really happy was when he was working. (R. at 652.) Manning recommended he speak to the doctor about antidepressants, and Lexapro was prescribed the same day. (R. at 652.) Moore saw Dr. John Marshall, M.D., at Highlands Neurosurgery, on March 19, 2008, for worker's compensation treatment of his back. (R. at 654.) He had a negative discogram and EMG, and no surgical lesion was identified. (R. at 654.)

---

[9] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-5), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Dr. Marshall relayed Moore's worker's compensation diagnosis of lumbosacral strain superimposed on lumbosacral spondylosis from a December 2005 work injury. (R. at 654.) Moore reported doing well with Lortab and Zanaflex. (R. at 654.) Dr. Marshall noted that Moore previously had reached maximum medical improvement, and he had previously returned him to work without restrictions, although Moore had not done so. (R. at 654.) Moore's physical examination was stable, and he was in a fairly good mood. (R. at 654.) Dr. Marshall continued him on Lortab, Zanaflex and a home exercise program. (R. at 654.) Moore returned to Manning on May 8, 2008, reporting that medication was helping him sleep, but he continued to have panic attacks in stores. (R. at 700.) He also reported bad dreams, depression and crying spells. (R. at 700.) Moore's Lexapro dosage was increased. (R. at 700.)

When Moore saw Dr. Paul Augustine, M.D., with Stone Mountain Health Services, on May 12, 2008, he reported doing well except for some back pain with radiation into the lower extremities. (R. at 693.) Moore exhibited minimal tenderness and spasm in the paralumbar muscle area, and straight leg raise testing was minimally positive bilaterally. (R. at 693.) Dr. Augustine diagnosed chronic lumbago and probable sciatica, among other things. (R. at 693.) When Moore returned to Manning on May 22, 2008, he reported decreased depressive symptoms since increasing his medication. (R. at 1080.) He noted that he was not as tearful, he was able to sleep, and he was beginning to enjoy life again, but he continued to experience anxiety and an inability to go into stores. (R. at 1080.) Manning advised Moore to continue his medications and work on desensitization regarding crowds. (R. at 1080.)

Moore saw Dr. Mark Stowe, M.D., for a one-time consultative examination on June 25, 2008. (R. at 702-07.) Dr. Stowe deemed Moore unreliable. (R. at 704.) Moore estimated that he could sit for 20 minutes, stand for 30-40 minutes and walk for 200 yards. (R. at 704.) He stated that he could not bend, but could occasionally stoop and crouch. (R. at 704.) Moore reported sharp, bilateral low back pain that was worsened with movement and which radiated into both legs to the knees. (R. at 704.) Dr. Stowe found Moore's short- and long-term memory good, and he noted a normal affect and thought content. (R. at 705.) He further noted that Moore walked without any assistive device, and he had no severe difficulty getting on and off of the examination table. (R. at 705.)

On physical examination, Moore exhibited full muscle strength bilaterally, intact cranial nerves, 2+ symmetrical reflexes, no sensory deficits, and he was nonfocal neurologically. (R. at 706.) There was a reduced range of motion of the dorsolumbar spine and the left shoulder. (R. at 703.) Dr. Stowe diagnosed chronic low back pain and left shoulder pain/strain. (R. at 706.) Dr. Stowe opined that Moore could sit for two to three hours and walk for two hours in an eight-hour workday with normal breaks without assistive devices, he could frequently lift and carry items weighing 10-20 pounds, he could occasionally lift and carry items weighing up to 50 pounds, he could occasionally bend, stoop and crouch, and he could frequently reach, handle, feel, grasp and finger objects. (R. at 707.) Dr. Stowe further opined that Moore would have workplace limitations secondary to heights. (R. at 707.) Dr. Stowe's final diagnoses were low back pain and hypertensive urgency. (R. at 707.)

On July 17, 2008, Dr. Robert McGuffin, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Moore, finding

that he could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 710-17.) He found that Moore could stand and/or walk for two hours in an eight-hour workday and that he could sit for about six hours in an eight-hour workday. (R. at 711.) Dr. McGuffin further found that Moore's ability to push/pull was unlimited, aside from the lifting and carrying limitations. (R. at 711.) He found that Moore could occasionally climb, balance, stoop, kneel, crouch and crawl, but he imposed no manipulative, visual or communicative limitations. (R. at 712-13.) However, Dr. McGuffin found that Moore should avoid all exposure to hazards such as heights and machinery. (R. at 713.) Dr. McGuffin disagreed with Dr. Stowe's findings, and he deemed Moore's allegations partially credible. (R. at 714, 717.)

The same day, Joseph I. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), concluding that Moore suffered from a nonsevere affective disorder and anxiety-related disorder. (R. at 718-31.) Leizer found that Moore had no restrictions on his activities of daily living, mild difficulty maintaining social functioning and maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation, each of extended duration. (R. at 728.) Leizer deemed Moore's statements partially credible. (R. at 730.) He further found that Moore's activities of daily living appeared to be limited by physical, as opposed to psychological, complaints. (R. at 731.)

When Moore returned to Dr. Marshall on September 10, 2008, he reported feeling a little shaky in the mornings, which he attributed to Zanaflex. (R. at 899.) Physical examination was stable. (R. at 899.) On December 18, 2008, when Moore saw Dr. Augustine, he was stable and in no distress. (R. at 742-43.) Physical

examination showed some paralumbar muscle spasm, mostly on the right side, as well as positive straight leg raise testing on the right side. (R. at 743.) Moore reported his Lortab dosage was not controlling his pain. (R. at 742.) Dr. Marshall diagnosed chronic lumbago and right sciatica, he increased Moore's Lortab dosage, and he ordered x-rays and an MRI of the lumbar spine. (R. at 742.) When Moore returned to Dr. Augustine on December 26, 2008, he had no complaints except chronic lumbago and occasional radiation into the legs in the morning. (R. at 750.) He was alert, oriented and in no distress. (R. at 750.) Moore had no focal deficits, and there was only mild paralumbar muscle spasm and minimally positive straight leg raise testing bilaterally. (R. at 750.) Dr. Augustine diagnosed bilateral sciatica. (R. at 750.)

A December 29, 2008, x-ray of the lumbar spine showed Grade I spondylolisthesis at L5-S1, isthmic type. (R. at 1100.) A January 9, 2009, MRI of the lumbar spine showed degenerative disc changes from L2-S1, especially at L5-S1, where there was Grade I spondylolisthesis, loss of stature of intervertebral discs and bulging annulus fibrosis with encroachment of the exiting spinal nerves bilaterally. (R. at 765-66.) There also was facet joint arthrosis from L2-S1. (R. at 766.) When Moore returned to Dr. Augustine on January 19, 2009, he was asymptomatic, and physical examination was normal. (R. at 1117.)

Dr. Thomas Phillips, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Moore on January 23, 2009. (R. at 788-95.) Dr. Phillips found that Moore could occasionally lift and carry items weighing up to 20 pounds, frequently lift and carry items weighing up to 10 pounds, stand and/or walk for up to two hours with normal breaks and sit for about six hours with normal breaks. (R. at 789.) Dr. Phillips found that Moore's ability to

push and/or pull was unlimited, and he found that Moore could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 789-90.) He imposed no manipulative, visual or communicative limitations, but found that Moore should avoid all exposure to hazards such as machinery and heights. (R. at 790-91.) Dr. Phillips found that the objective findings did not support the restrictions imposed by Dr. Stowe. (R. at 792.) He deemed Moore partially credible. (R. at 795.)

Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment, of Moore on January 24, 2009. (R. at 796-99.) He found that Moore was moderately limited in his ability to understand, remember and carry out detailed instructions, but there was no evidence of limitation in the abilities to make simple work-related decisions and to ask simple questions or request assistance. (R. at 796-97.) In all other areas of mental functioning, Milan found that Moore was not significantly limited. (R. at 796-97.) Milan concluded that the medical evidence established borderline intellectual functioning, depression and anxiety. (R. at 798.) He deemed Moore's statements partially credible. (R. at 798.) Milan considered a 2007 psychological evaluation completed by psychologist B. Wayne Lanthorn, but gave it little weight due to inconsistencies with the totality of the evidence in the file. (R. at 798.) He concluded that Moore was able to meet the basic mental demands of competitive work on a sustained basis despite limitations resulting from his mental impairment. (R. at 798.)

Milan also completed a PRTF, finding that Moore suffered from an affective disorder, mental retardation[10] and an anxiety-related disorder, but that a residual

---

[10] Milan's finding of mental retardation is based on Moore's borderline intellectual functioning diagnosis. (R. at 804.)

functional capacity assessment was necessary. (R. at 800-13.) Milan found that Moore was mildly restricted in his activities of daily living, experienced mild difficulties in maintaining social functioning, experienced moderate difficulties in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation, each of extended duration. (R. at 810.) Moore's statements were deemed partially credible. (R. at 812.)

On February 10, 2009, Dr. S.C. Kotay, an orthopedic surgeon, wrote a letter to Dr. Augustine following an examination of Moore. (R. at 835.) Moore reported low back pain with some gluteal pain, but no leg pain below the knee and no numbness. (R. at 835.) The lumbar spine showed a step at the L5-S1 level, but range of motion was normal. (R. at 835.) Straight leg raise testing, sitting root test and reflexes also were normal. (R. at 835.) Dr. Kotay noted the lumbar spine x-rays which showed spondylolisthesis at L5-S1, Grade I with severe narrowing of the joint space, as well as mild narrowing at the L2-L3 level with disc space deformity. (R. at 835.) He diagnosed degenerative arthritis of the spine secondary to congenital spondylolisthesis. (R. at 835.) Dr. Kotay reported no clinical evidence of nerve root compression, and he suggested anti-inflammatory medication on and off with Williams' exercises.[11] (R. at 835.)

When Moore returned to Dr. Marshall on March 18, 2009, he reported doing fairly well, but stated that Lortab was not working as well as before. (R. at 898.)

---

[11] The goal of Williams' flexion exercises is to reduce lumbar lordosis or flatten the lumbar curve. The general exercise protocol includes: (1) partial sit-ups; (2) knee-to-chest exercises; (3) hamstring stretches; (4) lunges; (5) seated flexion; and (6) squats. *See Whatever Happened to Williams' Flexion Exercises?*, DYNAMICCHIROPRACTIC.COM, http://www.dynamicchiropractic.com/mpacms/dc/article.php?id=35008 (last visited Oct. 8, 2013).

Physical examination was stable. (R. at 898.) Moore saw Dr. Augustine on May 2, 2009, with varied complaints unrelated to his back pain. (R. at 831.) He was alert, oriented and in no distress, and a physical examination was unremarkable. (R. at 831.) When Moore saw Dr. Marshall on September 16, 2009, he was doing well, and his health was stable. (R. at 897.) He described feeling a little nervous in the morning, but Zanaflex helped him sleep. (R. at 897.) Physical examination was stable. (R. at 897.) On September 25, 2009, Dr. TaranDeep Kaur, M.D., noted that Moore had a history of depression and anxiety. (R. at 830.) Moore was pleasant, alert and in no acute distress at that time.(R. at 830.) Dr. Kaur diagnosed depression, among other things. (R. at 830.) An October 6, 2009, x-ray of Moore's left shoulder showed only mild arthritic changes of the AC joint. (R. at 1278.)

When Moore saw Dr. Kaur on January 20, 2010, he reported that Lexapro was again working. (R. at 862-63.) He was alert, oriented and in no acute distress. (R. at 862.) On February 19, 2010, he was alert and oriented, and Dr. Kaur again diagnosed depression, among other things. (R. at 859-60.) Moore saw Dr. Marshall on April 14, 2010, reporting that Zanaflex and Lortab seemed to be helping with his pain and with function and self-care. (R. at 896.) Physical examination demonstrated stable motor, sensory and deep tendon reflexes, and Moore was ambulatory without assistive devices. (R. at 896.)

Moore was seen at Piedmont Community Services on July 7, 2010. (R. at 871.) He reported that his main concern was difficulty going out in public, and he stated that he had been depressed for an extended period of time. (R. at 871.) Moore reported difficulty sleeping and concentrating, feeling paranoid in public, which included getting nervous and hot, decreased energy and decreased interest in life. (R. at 871.) On July 19, 2010, he reported significant depression and social

anxiety, stating that he could not be in crowds. (R. at 870.) Moore reported that Lexapro no longer helped. (R. at 870.) Darwin Honeycutt, a licensed professional counselor, advised Moore to seek an increase in his Lexapro dosage and a starting dose of Abilify. (R. at 870.) When Moore returned to Honeycutt on July 27, 2010, he did not seem goal-oriented and had little affect. (R. at 869.) On August 12, 2010, Moore reported improved sleep and increased energy, but no improvement with his anxiety. (R. at 1295.) On August 26, 2010, Moore reported feeling better, but continued to experience significant social anxiety. (R. at 868.) Honeycutt urged him to become part of a small community group like Meals on Wheels or Habitat for Humanity. (R. at 868.)

On September 27, 2010, Moore informed Dr. Kaur that Lexapro made him sleepy, and he complained of numbness in both hands. (R. at 843-45.) Dr. Kaur ordered an MRI of the cervical spine, and he prescribed Zoloft. (R. at 843-45.) Moore returned to Dr. Marshall on October 13, 2010, stating that he was doing "okay," but he was taking more pain pills as a result of increased exercise. (R. at 895.) He further stated that he stopped taking Zanaflex because it made him shaky in the mornings. (R. at 895.) Motor, sensory and deep tendon reflexes were stable, and Moore was ambulatory without assistive devices. (R. at 895.) Dr. Marshall advised him to stay off Zanaflex, and he increased Moore's Lortab. (R. at 895.) He instructed Moore to take Advil or Aleve for breakthrough pain with exercise. (R. at 895.) A November 9, 2010, MRI of the cervical spine showed osteophytes arising from the uncovertebral joints from C3-C7 causing various degrees of impingement to the exiting spinal nerves bilaterally, as well as facet joint arthritis at C3-C7. (R. at 873-74.) On November 23, 2010, Dr. Kaur decided to treat Moore's neck pain conservatively. (R. at 881-83.)

On December 1, 2010, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Moore, finding that he could occasionally lift and carry items weighing up to 50 pounds and frequently lift and carry items weighing up to 25 pounds. (R. at 930-35.) Dr. Surrusco also found that Moore could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (R. at 931) He further found that Moore's ability to push and/or pull was unlimited. (R. at 931.) Dr. Surrusco imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 932-33.)

On December 8, 2010, Julie Jennings, Ph.D., a state agency psychologist, completed a PRTF, finding that Moore had a nonsevere affective disorder and anxiety-related disorder, resulting in mild restrictions on his activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence or pace and no repeated episodes of decompensation, each of extended duration. (R. at 936-47.)

On March 1, 2011, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, completed a consultative psychological evaluation of Moore at the request of Moore's attorney. (R. at 1328-37.) Moore reported that his back had worsened since a prior evaluation in 2007, noting significant pain in the lumbar area, especially the right side, radiating down the leg. (R. at 1330.) He reported not doing much of anything, stating he walked to his mailbox daily, but noting that almost anything increased his pain. (R. at 1331.) He reported that his mother performed virtually all of the household chores and grocery shopping. (R. at 1331-32.)

Lanthorn noted no clinical signs or symptoms associated with delusional thinking, ongoing psychotic processes or hallucinations. (R. at 1332.) Moore reported sleeping fitfully, even with medication, and continued depression despite taking Lexapro and Abilify. (R. at 1332.) He stated that he preferred to be alone and withdraws even from family. (R. at 1332.) Moore denied suicidal or homicidal ideation, intent or plan. (R. at 1333.) He reported often being anxious, tense, on edge, shaky and having nausea, a terrible memory, distractible, having a wandering mind, poor concentration and finding it difficult to initiate and complete tasks. (R. at 1333.)

Lanthorn administered the Minnesota Multiphasic Personality Inventory -- Second Edition, ("MMPI-2"). (R. at 1333-34.) Lanthorn found that, overall, Moore generated a valid profile, but reported that it must be interpreted with caution due to responses toward the end of the test itself. (R. at 1334.) Test results indicated Moore was very depressed, which contributed directly to social withdrawal and poor concentration. (R. at 1334.) Test results also indicated the presence of significant anxiety. (R. at 1334.) Lanthorn concluded that Moore's psychopathology was quite serious and included confused thinking, difficulties with logic and concentration and impaired judgment. (R. at 1334.) Lanthorn diagnosed major depressive disorder, recurrent, severe; anxiety disorder with panic attacks and generalized anxiety due to chronic physical problems, pain, etc.; pain disorder associated with both psychological factors and general medical condition, chronic; and borderline intellectual functioning. (R. at 1335-36.) He assessed Moore's then-current Global Assessment of Functioning, ("GAF"), score at 45-50.[12] (R. at 1336.) He strongly encouraged Moore to continue receiving ongoing

_____

[12] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health—illness." DIAGNOSTIC

psychiatric and psychotherapeutic intervention. (R. at 1336.) Compared with the 2007 evaluation, Lanthorn found that Moore's functioning had worsened, noting that he was more depressed, more anxious, had panic attacks, was socially withdrawn and having marked difficulties in functioning on a day-to-day basis. (R. at 1336.) Lanthorn concluded that Moore's psychopathology prevented him from sustaining gainful employment at that time. (R. at 1337.)

Lanthorn also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), finding that Moore had a good ability to understand, remember and carry out simple job instructions, a fair ability to follow work rules, to maintain attention and concentration, to understand, remember and carry out detailed job instructions and to maintain personal appearance and a poor or no ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 1339-41.)

On August 1, 2011, Dr. Kaur completed an Assessment Of Ability To Do Work-Related Activities (Physical), finding that Moore could lift and/or carry items weighing up to five pounds occasionally and up to 10 pounds frequently. (R. at 7-9.) He further found that Moore could stand and/or walk for a total of two hours in an eight-hour workday without interruption due to neck pain with radiculopathy. (R. at 7.) Dr. Kaur found that Moore could sit for a total of one

AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

hour in an eight-hour workday. (R. at 8.) He found that Moore could never climb, stoop, kneel, crouch or crawl due to impingement, but that he could frequently balance. (R. at 8.) He found that Moore's abilities to reach, to handle, to feel and to push and/or pull objects were limited due to decreased strength in the upper extremities. (R. at 8.) Lastly, Dr. Kaur found that Moore was restricted in his ability to work around heights, moving machinery, chemicals, dust, fumes and vibration. (R. at 9.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist

in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), §1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McClain v Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 8, 2011, the ALJ denied Moore's claims. (R. at 18-29.) The ALJ found that Moore had the residual functional capacity to perform a range of medium work, but that he had no useful ability to function in the areas of understanding/remembering detailed instructions and interacting appropriately with the general public, he was significantly limited, but not precluded, in his abilities to carry out detailed instructions and to get along with co-workers/peers, and he had moderate-to-marked impairment in his ability to use public transportation. (R. at 23.) The ALJ further found that Moore would miss approximately two to three days of work annually as a result of his mental conditions. (R. at 23.) The ALJ concluded that Moore was able to perform his past relevant work as a general laborer. (R. at 28.) Therefore, the ALJ found that Moore was not under disability as defined in the Act and was not eligible for benefits. (R. at 29.) *See* 20 C.F.R.§§ 404.1520(f), 416.920(f).

Moore argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 6-8). He also argues that the ALJ erred by failing to find that his impairment met or equaled the listing for disorders of the spine found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(A). (Plaintiff's Brief at 8-9.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997.)

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Moore first argues that the ALJ erred in his residual functional capacity finding. (Plaintiff's Brief at 6-8). The main thrust of Moore's argument is that the ALJ should have applied the doctrine of res judicata to the ALJ's March 19, 2010, decision, in which he was found to have the residual functional capacity for only light work. He argues that the only way that the ALJ could have deviated from this prior residual functional capacity finding was to show medical improvement. I find that Moore's argument lacks merit. This court, in *Large v. Barnhart*, 2006

WL 36751 (W.D. Va. Jan. 6, 2006), held that because an ALJ's prior decision never became final, res judicata was inapplicable. In that case, the earlier ALJ's decision found that the claimant retained the residual functional capacity for light work, but the district court reversed and remanded that decision, and it was subsequently vacated by the Appeals Council. Therefore, the court held that the ALJ presiding over the subsequent hearing was not bound by the previously vacated decision and was free to find that the claimant was capable of medium work if substantial evidence supported such a finding. *See Large*, 2006 WL 36751, at *6 (citing *Taylor v. Sullivan*, 1993 WL 219288, at *4 n.1 (N.D. Cal. June 14, 1993) ("When the Appeals Council vacates an ALJ's decision, neither of these decisions become the 'final decision' of the Secretary and they have no res judicata effect.")).

Here, the Appeals Council vacated the March 19, 2010, decision by Order dated September 23, 2010, and remanded the case to an ALJ for further development. (R. at 149-52.) As in *Large*, I find that the prior ALJ's decision was not a "final" decision, and the doctrine of res judicata simply does not apply. Therefore, as long as the ALJ's residual functional capacity finding is supported by substantial evidence, this court will find no error by the ALJ in this regard. For all of the following reasons, I find that the ALJ's residual functional capacity finding is so supported. I will address Moore's physical and mental residual functional capacities separately.

I find that the ALJ's finding that Moore could perform a range of medium work is supported by substantial evidence. First, as the ALJ stated in his decision, evidence was submitted that was not submitted for the prior ALJ's consideration, indicating that Moore could perform medium work. In particular, in September

2008, Dr. Marshall, Moore's treating worker's compensation physician, noted that Moore previously had been released to return to work without restrictions. Moore's prior work was as an underground coal miner, which the vocational expert classified as heavy and skilled. (R. at 71.) Additionally, several physical examinations over the time period relevant to the court's decision were normal or stable, and Moore responded positively to medications. In March 2008, Moore reported doing well with Lortab and Zanaflex, and physical examination was stable. (R. at 654.) In May 2008, he reported some back pain with some radiation into the lower extremities, but physical examination showed only minimal tenderness and muscle spasm in the paralumbar area, and straight leg raise testing was minimally positive bilaterally. (R. at 693.) Physical examination on June 25, 2008, revealed full muscle strength bilaterally, intact cranial nerves, 2+ symmetrical reflexes, no sensory deficits, and Moore was nonfocal neurologically. (R. at 706.) In September 2008, physical examination was described as stable, and in December 2008, when Moore had some paralumbar muscle spasm and positive straight leg raise testing on the right, his dosage of Lortab was increased. (R. at 742-43.) Later that month, he had no focal deficits and exhibited only mild paralumbar muscle spasm and minimally positive straight leg raise testing bilaterally. (R. at 750.) A January 2009 physical examination was normal. (R. at 1117.) In February 2009, Moore reported that he had low back pain with some gluteal pain, but no leg pain below the knee and no numbness. (R. at 835.) Straight leg raise testing, sitting root test and reflexes all were normal. (R. at 835.) Dr. Kotay noted no clinical evidence of nerve root compression, and he suggested only anti-inflammatory medication on and off with Williams' exercises. (R. at 835.)

In March 2009, Moore reported doing fairly well, and physical examination was stable, and in May 2009, physical examination remained unremarkable. (R. at

831, 898.) When Moore saw Dr. Marshall in September 2009, he was doing well, and his health was stable. (R. at 897.) In April 2010, Moore reported that Zanaflex and Lortab seemed to helping with his pain and with function and self-care. (R at 896.) Physical examination showed stable motor, sensory and deep tendon reflexes, and Moore was ambulatory without assistive devices. (R. at 896.) In October 2010, Moore reported doing "okay," but having more pain, which he attributed to increased exercise. (R. at 895.) Motor, sensory and deep tendon reflexes were again stable, and Moore was ambulatory without assistive devices. (R. at 895.) Dr. Marshall increased Moore's dosage of Lortab. (R. at 895.)

In addition to these mostly normal clinical examinations and positive response to medication, neither of Moore's treating physicians placed any limitations on his physical activities, and Dr. Marshall even explicitly returned him to work without restrictions. Furthermore, I find that the ALJ properly weighed the opinion evidence regarding Moore's physical residual functional capacity and that the opinion properly afforded the most weight by the ALJ supports the physical residual functional capacity finding.

The opinion evidence consists of three Physical Residual Functional Capacity Assessments from state agency physicians, one completed by the one-time consultative examiner Dr. Stowe, and one from Dr. Kaur. Dr. Stowe found that Moore could sit for only two to three hours, stand for two to three hours and walk for two hours in an eight-hour workday with normal breaks without assistive devices, that he could frequently lift and carry items weighing 10 to 20 pounds, occasionally lift and carry items weighing up to 50 pounds, occasionally bend, stoop and crouch and frequently reach, handle, feel, grasp and finger objects. (R. at 707.) Dr. Stowe further opined that Moore would have workplace limitations

secondary to heights. (R. at 707.) I find that the ALJ appropriately afforded little weight to this opinion for multiple reasons. First, Dr. Stowe himself deemed Moore unreliable, noting that, despite Moore's allegations of disabling limitations, he walked without any assistive devices and had no severe difficulty getting onto and off of the examination table. (R. at 704-05.) Additionally, Dr. Stowe's own physical examination of Moore, described herein, was normal except for some reduced range of motion of the dorsoumbar spine and left shoulder. (R. at 703.) Thus, I find that his opinion is internally inconsistent with and unsupported by the other substantial evidence of record as a whole, including notes of Moore's treating physicians, as stated above.

State agency physicians Dr. McGuffin's and Dr. Phillips's physical assessments, completed in July 2008 and January 2009, respectively, concluded that Moore could perform a range of light work. (R. at 710-17, 788-95.) They both explicitly disagreed with Dr. Stowe's opinions regarding Moore's physical limitations. (R. at 714, 792.) More recently, in December 2010, Dr. Surrusco, another state agency physician, completed a physical assessment, concluding that Moore could perform medium work. (R. at 930-35.) In arriving at this conclusion, Dr. Surrusco noted a September 27, 2010, examination which yielded a completely normal physical examination, and which reflected no complaints of back or shoulder pain. (R. at 935.) He further noted that during an examination by a neurologist on October 13, 2010, it was reported that, despite being returned to work without restrictions, Moore never did so, and physical examination on that date showed stable motor strength, intact sensation, stable deep tendon reflexes and an ability to ambulate without assistance. (R. at 935.)

I find that the ALJ properly afforded considerable weight to Dr. Surrusco's assessment, as it is supported by the evidence of record as a whole and as stated previously herein. Dr. Kaur, who treated Moore primarily for hypertension, also submitted a physical assessment of Moore to the Appeals Council. In its Notice of Action, the Appeals Council stated that, because the ALJ decided Moore's case through April 8, 2011, Dr. Kaur's assessment, dated August 1, 2011, did not affect the ALJ's decision about whether Moore was disabled beginning on or before April 8, 2011. (R. at 2.) I agree. There is nothing in Dr. Kaur's assessment to indicate that the findings contained therein relate back to the time period relevant to this court's determination as to whether the ALJ's physical residual functional capacity finding is supported by substantial evidence.

Lastly, I find that the ALJ's conclusion that Moore could perform medium work also is supported by the fact that his treatment over the course of the relevant time period was conservative in nature, consisting of medications and exercise. Furthermore, Moore has provided no evidence that he sought emergency room treatment for his back impairment, epidural steroid injections were not recommended, surgical intervention was not recommended, and Moore was never hospitalized due to his back impairment. It is for all of these above-stated reasons that I find that the ALJ's conclusion that Moore could perform a range of medium work on or before April 8, 2011, is supported by substantial evidence. For the reasons that follow, I find that the ALJ's mental residual functional capacity finding also is supported by substantial evidence.

In the April 2011 decision, the ALJ concluded that Moore was unable to function in the areas of understanding/remembering detailed instructions and interacting appropriately with the general public, that he was significantly limited,

but not precluded, in his ability to carry out detailed instructions and to get along with co-workers/peers and that he was moderately-to-markedly impaired in his ability to use public transportation. (R. at 23.) He further found that Moore would be absent from work two to three days per year as a result of his mental conditions. (R. at 23.) It appears that Moore is arguing that the ALJ erred by affording little weight to psychologist Lanthorn's March 2011 opinion. In particular, Lanthorn opined that Moore's mental impairments prevented him from sustaining gainful employment. (R. at 1337.) Lanthorn's opinion, set out in greater detail herein, consisted of findings that Moore had a seriously limited ability, resulting in unsatisfactory work performance, in four work-related mental abilities, and no useful ability in 10 work-related mental abilities. (R. at 1339-40.) Lanthorn opined that Moore's mental impairments would cause him to be absent from work more than two days monthly. (R. at 1341.)

I find that substantial evidence supports the ALJ's mental residual functional capacity finding and his weighing of the evidence related thereto. First, as cited by the ALJ, Moore's history of mental health treatment is scant. Moore saw mental health counselors at Caring Hearts and Piedmont Community Services from February 2008 through August 2010 for a total of approximately 10 times. His complaints consisted of depression related to being out of work and anxiety or panic attacks when going into stores. After being prescribed Lexapro, his depressive symptoms improved for some time, but he continued to complain of anxiety. Treatment focused on desensitization regarding crowds. By July 2010, Moore reported that Lexapro no longer helped his symptoms, and combination therapy was initiated with Abilify and an increased dosage of Lexapro. The following month, Moore reported improvement with his depressive symptoms, and

he was urged to become part of a small community group such as Meals on Wheels or Habitat for Humanity.

There is one Mental Residual Functional Capacity Assessment, completed by state agency psychologist Milan, contained in the record. In January 2009, Milan opined that Moore was moderately limited in his ability to understand, remember and carry out detailed instructions, and that there was no evidence of limitation in the abilities to make simple work-related decisions and to ask simple questions or request assistance. (R. at 796-97.) In all other areas of work-related mental abilities, Milan found that Moore was not significantly limited. (R. at 796-97.) Milan concluded that the medical evidence established borderline intellectual functioning, depression and anxiety, but he opined that Moore was able to meet the basic mental demands of competitive work on a sustained basis despite limitations resulting from his impairments. (R. at 798.)

There are three PRTFs, completed by state agency psychologists Milan, Leizer and Jennings, contained in the record. Leizer opined that Moore had no restrictions on his activities of daily living, mild difficulty maintaining social functioning and mild difficulty maintaining concentration, persistence or pace. (R. at 728.) Milan opined that Moore was mildly restricted in his activities of daily living, experienced mild difficulty maintaining social functioning and experienced moderate difficulty maintaining concentration, persistence or pace. (R. at 810.) Julie Jennings, another state agency psychologist, completed a PRTF in December 2010, finding that Moore had a nonsevere affective disorder and anxiety-related disorder, resulting in mild restrictions on his activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence or pace, and that Moore had experienced no repeated

episodes of decompensation, each of extended duration.  (R. at 936-47.)  I find that the ALJ properly afforded Jennings's opinion little weight because she found that Moore's mental impairments were nonsevere, a finding that is contradicted by the record evidence.

Robert Muller, the medical expert who testified at Moore's hearing, opined that the evidence as a whole did not support the limitations found by Lanthorn.  (R. at 63.) He also found that Moore's limitations due to his mental impairment would not meet a listing and would not interfere with his ability to perform simple routine work.  (R. at 63-64.) Muller concluded that while Moore suffered from significant symptoms from anxiety and depression, even with medication, employment was not precluded. (R. at 64.) He opined that Moore was moderately limited in his activities of daily living, experienced moderate difficulty in social functioning and experienced moderate difficulty with concentration, persistence or pace. (R. at 66.) Muller further opined that Moore was markedly limited in his ability to understand and remember detailed instructions, moderately limited in his ability to maintain attention and concentration for extended periods and at least mildly limited in his ability to complete a normal workday or workweek without interruptions from psychologically based symptoms. (R. at 67-68.) He found that Moore was moderately-to-markedly limited in his ability to interact appropriately with the general public, moderately limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and moderately-to-markedly limited in his ability to use public transportation. (R. at 68-69.)

In his decision, the ALJ stated that he was giving Lanthorn's opinions no significant weight because they were not consistent with the credible objective evidence of record, including treatment notes. (R. at 27.) The ALJ also afforded

little weight to state agency psychologist Jennings's December 2010 opinion, which found Moore did not suffer from a severe mental impairment. (R. at 28.) The ALJ afforded significant weight to the opinion of Muller, the medical expert, because it was consistent with the evidence of record, including treatment notes. (R. at 27.) Based on the treatment notes cited herein, which show that Moore was never psychiatrically hospitalized, sought little mental health treatment, continued to suffer significant depressive and anxiety symptoms despite a somewhat positive response to medication, and was deemed able to perform substantial gainful employment despite his symptoms, I find that substantial evidence supports the ALJ's weighing of the evidence regarding Moore's mental residual functional capacity, as well as the mental residual functional capacity finding itself.

Moore also argues that, pursuant to Social Security Ruling, ("SSR"), 96-8p, the ALJ erred by failing to illustrate specific work-related activities affected by his significantly limited, but not precluded, abilities and his moderate-to-marked impairments. He contends that the ALJ was obligated to set out his findings in terms of a function-by-function assessment. I find Moore's argument unpersuasive. I first note that the Fourth Circuit has held that Social Security Rulings are interpretations by the Social Security Administration of the Social Security Act that do not have the force of law, but are entitled to deference unless they are clearly erroneous or inconsistent with law. *See Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995). As this court held in *Meadows v. Astrue*, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing *Davis v. Astrue*, 2010 WL 5237850, at *3 (D. Md. Dec. 16, 2010)), while SSR 96-8p requires a function-by-function analysis, it does not require the ALJ to produce such a detailed statement in writing. Instead, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion…." *Meadows*, 2012 WL 3542536, at *8 (quoting SSR 96-8p at

*7); *see also Davis*, 2010 WL 5237850 at *5; *Fleming v. Barnhart*, 284 F. Supp. 2d 256, 271 (D. Md. 2003). As this court in *Manring v. Barnhart*, 2007 WL 201081, at *4 (W.D. Va. Jan. 25, 2007), found, "[i]n reading the requirements of SSR 96-8p, [Moore] conflates what must be considered in assessing RFC and what must be fully discussed in the ALJ's notice of decision." Here, I find that the ALJ adequately explained his determination in narrative form. He discussed Moore's functional limitations related to his mental impairment. The ALJ's discussion of Moore's mental health treatment history, his response to medication, his continued significant depression and anxiety even with medication and the ALJ's detailed evaluation of the opinion evidence in the record, including that provided by the medical expert at the hearing, fully satisfied the requirements of SSR 96-8p.

Moore next argues that the ALJ erred by failing to find that his impairment(s) met or equaled the listing for disorders of the spine, found at 20 C.F.R., Part 404, Subpart P, § 1.04(A). (Plaintiff's Brief at 8-9.) I disagree. Section 1.04(A) requires that the disorder result in compromise of the nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test. For a claimant to demonstrate that his impairments meet or equal a listed impairment, he must prove that he "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). Here, I find that there is some evidence to support a finding that Moore's impairment(s) results in compromise of the nerve root or spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine and positive

straight leg raise testing, but there is no evidence to demonstrate motor loss accompanied by sensory or reflex loss. A January 2009 MRI of the lumbar spine showed degenerative changes of the intervertebral discs and bulging annulus fibrosis with encroachment of the exiting spinal nerves bilaterally. (R. at 765-66.) A November 2010 MRI of the cervical spine showed osteophytes arising from the uncovertebral joints from C3-C7 causing various degrees of impingement to exiting spinal nerves bilaterally. (R. at 873-74.) While there is some evidence in the record to support the Commissioner's position that Moore's impairments did not result in the requisite nerve root compression, I will give Moore the benefit of the doubt in finding that he has demonstrated otherwise. There also is evidence of neuro-anatomic distribution of pain, as well as positive straight leg raise testing. In May 2008, Moore had slightly positive bilateral leg raise testing. (R. at 693.) In June 2008, Moore reported that his back pain radiated into both legs to the knees. (R. at 704.) In December 2008, he complained of occasional radiation into the legs in the mornings, and straight leg raise testing was positive on the right side. (R. at 742-43, 750.) Later that month, Moore again exhibited minimally positive straight leg raise testing bilaterally. (R. at 750.) In February 2009, Moore reported back pain that radiated into the gluteal area and to the knees. (R. at 835.)

Despite these findings, however, I find that there is no evidence in the record that Moore suffers any motor loss accompanied by sensory or reflex loss, as required by § 1.04(A). In June 2008, Moore had full muscle strength bilaterally, intact cranial nerves, 2+ symmetrical reflexes and no sensory deficits. (R. at 706.) In February 2009, Dr. Kotay, an orthopedic surgeon, reported normal straight leg raise testing, sitting root test and reflexes. (R. at 835.) In April 2010, physical examination showed stable motor, sensory and deep tendon reflexes. (R. at 896.)

In October 2010, Moore's motor, sensory and deep tendon reflexes were stable. (R. at 895.)

Based on the above, I find that, even giving Moore the benefit of the doubt that his back impairment results in compromise of a nerve root or spinal cord characterized by neuro-anatomic distribution of pain and positive straight leg raise testing, he still has failed to demonstrate any motor loss accompanied by sensory or reflex loss. That being said, I find that substantial evidence supports the ALJ's finding that Moore's back impairment does not meet the criteria of § 1.04(A).

Based on the above-cited evidence, I find that substantial evidence supports the ALJ's physical and mental residual functional capacity finding, as well as his finding that Moore's back impairment does not meet the criteria of § 1.04(A). Therefore, I find that substantial evidence supports the ALJ's finding that Moore is not disabled and not entitled to DIB or SSI benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.      Substantial evidence exists in the record to support the ALJ's weighing of the evidence related to Moore's physical impairments;

2.      Substantial evidence exists in the record to support the ALJ's physical residual functional capacity finding;

3.      Substantial evidence exists in the record to support the ALJ's weighing of the evidence related to Moore's mental impairments;

4.      Substantial evidence exists in the record to support the ALJ's mental residual functional capacity finding;

5.      Substantial evidence exists in the record to support the ALJ's finding that Moore's back impairment does not meet the criteria of § 1.04(A); and

6.      Substantial evidence exists in the record to support the ALJ's finding that Moore was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Moore's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. §636(b)(1)(C) (West 2006 & Supp. 2013):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of

the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      October 8, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE